## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUSAN MOZELESKI,

        *Plaintiff,*

    v.

MAIN LINE HOSPITALS, INC.,
MICHELLE MACEDON and STACEY
PRICE,

        *Defendants.*

CIVIL ACTION
NO. 21-2043

**PAPPERT, J.**                                                            **March 23, 2022**

### MEMORANDUM

    Susan Mozeleski, who is hearing impaired, worked for over thirty years as a nurse and nurse manager at Lankenau Hospital, part of the Main Line Health system. She sued Main Line Hospitals, Inc. and two of her supervisors, Michelle Macedon and Stacey Price, for disability and age discrimination, bringing claims under the Americans with Disabilities Act, Age Discrimination in Employment Act and Pennsylvania Human Relations Act. Six of Mozeleski's seven claims are against all three defendants. The seventh, for aiding and abetting under the PHRA, is against Macedon and Price only. The Defendants moved for summary judgment. In her Response, Mozeleski withdrew all age-based claims as well as a claim for constructive discharge that was not expressly pleaded, though alluded to in her Complaint.[1]

---

[1]     (Pl.'s Memo in Opp. to Defs.' Summ. J. Mot. n.1, ECF 16-1.) At oral argument, she agreed to dismiss her ADA claims against Macedon and Price because employees cannot face "individual damages liability" under the ADA. *Fasano v. Federal Reserve Bank of New York*, 457 F.3d 274, 289 (3d Cir. 2006) (citing *Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002)); (Oral Arg. Tr. 2:19–24, ECF 23).

After reviewing the parties' filings and record evidence and holding oral argument, the Court grants the Defendants' Motion and enters judgment on all remaining claims.  Mozeleski's case is built on her unsupported suspicions and perceptions that routine workplace interactions with supervisors were motivated by disability-based prejudice and retaliatory aims.  The record evidence shows Mozeleski never suffered an adverse employment action or was retaliated against because of her hearing impairment.

I

A

1

Mozeleski worked at Lankenau from March of 1988 until April of 2020. (Mozeleski Dep. 29:11–22, Exs. A & J, ECF 15-3 & 16-2.)  After beginning as an operating room staff nurse, she was promoted to the specialty team coordinator position in the early 1990s.  (*Id.* at 29:11–15, 30:7–15.)  In 2002, she was transferred from Lankenau's main operating room to its Surgicenter, which mostly handles outpatient procedures, and worked there for the remainder of her employment.  *See* (*id.* at 30:22–31:11).  Ten years later, she was promoted to the administrative coordinator position. (*Id.* at 35:11–15.)  One of Mozeleski's responsibilities in this role was to prepare performance appraisals for approximately seventeen staff members.  (*Id.* at 36:8–15.) In June of 2018, Mozeleski was promoted again—to assistant nurse manager.  (*Id.* at 37:13–19.)

Mozeleski's direct supervisor from 2014 through October of 2018 was Annette Frawley.  (Defs.' Statement of Material Facts (SOMF) ¶ 6, ECF 15-2.)  In November of

2

2018, Michelle Macedon was appointed as the Surgicenter's nurse manager and replaced Frawley as Mozeleski's immediate supervisor; and Stacey Price was appointed director of surgical services. (Mozeleski Dep. 60:5–6, 72:15–20, 73:8–13.) Macedon reported to Price, making the chain of command Mozeleski to Macedon to Price. *See* (*id.* at 73:2–4). Macedon and Price were the only two people at Lankenau who Mozeleski says harassed or discriminated against her. *See* (*id.* at 201:21–202:1).

Mozeleski has had a hearing disability since childhood and worn hearing aids for roughly thirty years, but denies her hearing impairment impeded her performance at Lankenau. (*Id.* at 312:6–8, 314:10–12.) She acknowledged, however, that her impairment can cause her to speak loudly. (*Id.* at 154:2–5.) It can also make it challenging for her to determine when others have finished talking. (*Id.* at 154:6–8.)

According to Mozeleski, Macedon, Price, Lankenau Director of Human Resources Greg Papa and "pretty much all of the surgeons and my staff" knew her hearing was impaired. (*Id.* at 315:7–11.) Mozeleski said she told Macedon and Price about her impairment in one of their first meetings in December of 2018, and that Frawley said she also told Macedon in the spring of 2018. (*Id.* at 154:18–156:7.) Price, however, testified that during her time at Lankenau she never knew Mozeleski was hearing impaired. (Price Dep. 21:4–19, Ex. L, ECF 16-2.) Macedon did not remember learning of it before Mozeleski filed, in an email, her formal discrimination complaint in March of 2019. *See* (Macedon Dep. 63:18–24, Ex. M, ECF 16-2); *infra* subsection I.A.4. Moreover, Mozeleski said Macedon never mentioned Mozeleski's hearing to her. (Mozeleski Dep. 154:13–17.)

2

Mozeleski suspects that Macedon and Price harassed and discriminated against her in numerous ways. To begin, soon after Macedon and Price began working in their new positions in November of 2018, Price requested that Mozeleski meet with them each month. (Mozeleski Dep. 81:9–13.)

In the January 2019 meeting, Macedon and Price told Mozeleski they wanted her to heed the chain of command at operating room steering committee meetings by clearing her remarks with them before speaking up. *See* (*id*. at 84:18–85:1, 87:7–14, 88:7–11). Multiple staff members, such as chiefs of surgery, coordinators and managers, attended these meetings. (*Id*. at 82:20–23.) Mozeleski believed Macedon and Price's instruction violated Main Line's "open" communication policies. (*Id*. at 88:18–89:8.)

Mozeleski claims that during the February 2019 meeting with Macedon and Price, Macedon told her she was loud and spoke over people, which offended Mozeleski. (*Id*. at 93:20–22.) Also, Price said Mozeleski should not have stated at a prior coordinator meeting that she felt she was doing the work of seven coordinators. (*Id*. at 92:4–17, 94:7–9.)

In March of 2019, Mozeleski felt harassed when Macedon sent her an email that, in Mozeleski's view, unfairly blamed her for certain "deficiencies" that could negatively impact an upcoming event. (*Id*. at 101:12–18, 102:9–22.) Mozeleski took this email "very personally." (*Id*. at 104:22.) Another point of discussion at the March 2019 meeting was Mozeleski's treatment of another employee, which Macedon felt was "dismissive." (*Id*. at 136:7–11.) According to Mozeleski, Macedon told her that she

should not be abrupt when communicating with others, advice Mozeleski felt was discriminatory.  (*Id.* at 138:9–13, 159:23–160:7.)

Also at the March 2019 meeting, Mozeleski told Macedon and Price that she felt they were demeaning and micromanaging her, but Macedon responded by email that the problem was Mozeleski's unit had been "unsupervised for years."  (*Id.* at 132:22–133:1, 134:23–135:13.)  As Mozeleski acknowledged, it was appropriate for Macedon to discuss areas of improvement with her, and "different managers have different styles."  (*Id.* at 139:4–12.)

3

Mozeleski said Macedon and Price also harassed or discriminated against her in settings other than their monthly meetings.  For example, in December of 2018 Macedon raised an important issue in front of staff members in a way Mozeleski felt was demeaning.  (Mozeleski Dep. 108:16–23, 111:5–11.)

Two months later, Price criticized Mozeleski for using the word "interesting" in an email.  (*Id.* at 114:4–17, 115:4–7.)  According to Mozeleski, Price said her use of this word reflected her unprofessional communication style, and Mozeleski understood this as Price "reaming [her] out."  (*Id.* at 115:18–22.)  In August of 2019, Price disapproved of Mozeleski using the expression "once again" in an email and asked Mozeleski to meet with her and Papa about it.  (*Id.* at 222:17–223:18; Defs.' SOMF ¶¶ 39–40.)  Mozeleski felt this was another instance of Price badgering her about her communication skills.  (Mozeleski Dep. 223:22–24.)

Mozeleski was also offended when Macedon told her, "you write how you talk."  (Pl.'s Counter Statement of Disputed Material Facts (CSDMF) ¶ 92, ECF 16-3.)  Yet

Macedon viewed her discussions with Mozeleski about her email communication as general "constructive feedback." (Macedon Dep. 43:13–19.)  Price, meanwhile, merely wanted Mozeleski to "just state the facts" in emails without exaggerating or being accusatory.  *See* (Price Dep. 32:14–34:8).

Another allegedly discriminatory incident occurred in February of 2019. According to Mozeleski, while she was making rounds at the Surgicenter with Macedon and Price, Price noticed unsigned temperature and humidity logs.  (Mozeleski Dep. 130:5–9.)  According to Mozeleski, supply workers were supposed to sign them.  (*Id.* at 129:21–130:5.)  Price said she wanted Mozeleski to do it anyway.  (*Id.* at 130:9–14.) Mozeleski, who did not oblige, understood the request as Price asking her to "falsify" the logs.  (*Id.* at 129:19–130:23.)  She felt this was harassment because it violated Main Line's "power gradient" policy.[2]  (*Id.* at 131:9–16.)

The next month, Mozeleski said, Macedon and Price falsely accused her of recording a conversation between the three of them, something that would have been illegal and against hospital policy.  (Mozeleski Dep. 142:22–143:6; Oral Arg. Tr. 79:23–80:4.)  In fact, about a week earlier, Mozeleski told a surgeon that she wished she could record Mozeleski's discussions in meetings with Macedon and Price because she was "very concerned" about these conversations.  (Mozeleski Dep. 145:9–19, 146:7–12.)[3]

Mozeleski was called to HR about this incident at around 2:30 one afternoon. (Mozeleski Dep. 142:22–143:6, 144:18.)  Although Mozeleski denied the accusation and

---

[2]     This policy seeks to "empower" employees to report concerns about patient safety and the employees' personal well-being.  (Oral Arg. Tr. 22:3–12, ECF 23.)

[3]     Mozeleski's testimony on this point is at odds with her representation at oral argument that Mozeleski's desire to record these conversations flowed from her inability to hear them.  *See* (Oral Arg. Tr. 41:16–25).

offered her phone as proof, she was ordered to leave the building pending an investigation.  (*Id.* at 143:6–12, 143:24–144:4.)  Though no one ever told her she was being suspended, Mozeleski interpreted this as an unpaid suspension because she clocked out early that day.  (*Id.* at 143:24–145:1, 145:2–4.)

Besides these discrete events, Mozeleski claims very generally that Macedon and Price "continually berated" her about her verbal communication style and "constantly nitpicked" her written communication style in emails.  (Pl.'s CSDMF ¶ 89; Mozeleski Dep. 116:23–24.)  Macedon and Price said they had "constant" and "repetitive" discussions or meetings with Mozeleski, but more specific testimony clarified both the frequency and topics of these conversations.  (Price Dep. 60:8–10; Macedon Dep. 42:14–15.)

Macedon remembers speaking with Mozeleski and Price about Mozeleski's communication "almost every other month."  (Mozeleski Dep. 42:10–12); *see supra* subsection I.A.2 (describing how Mozeleski, Macedon and Price met monthly).  In particular, Price described meeting with Mozeleski about "elevating her to the next level" as an assistant nurse manager and, because Mozeleski is "very reactionary" and "not a thoughtful person," helping her "slow down," "hear" and "listen" to Price and Macedon and "try to be thoughtful."  (Price Dep. 44:16–45:2.)  Price also described a range of other issues discussed with Mozeleski, including her "speaking negatively constantly" to staff, the need for her to "keep a positive attitude" and remain "united" with Macedon and Price, and Mozeleski's penchant for interrupting and speaking over others.  *See* (Price Dep. 60:8–61:7, 61:22–62:17.)

7

4

On March 18, 2019, Mozeleski sent an email to Linda Carrick, regional vice president for patient care services, with Papa copied, stating she was "initiating a harassment claim" based on her hearing impairment and age.  (Discrim. Compl., Ex. B, ECF 15-3.)  Mozeleski explained that in Macedon's four months directly supervising her, she had made "no effort" to learn how Mozeleski's unit operated.  (*Id.*)  Mozeleski had become "afraid to interact with" Macedon because of how she berated Mozeleski's "communication skills & behavior," conduct she felt violated the power gradient policy. (*Id.*)  Given Mozeleski previously had "great working relationships" with managers and received "excellent" performance evaluations, she could "only perceive" that Macedon's harassment was "related to [Mozeleski's] age & disability."  (*Id.*)

In April of 2019, Mozeleski met with Papa and Vice President of Nursing Fran Cusick to discuss her complaints of discrimination and harassment. (Mozeleski Dep. 173:12–19, 180:4–7.)  When asked what she wanted, Mozeleski said she hoped to continue working without being harassed.  (*Id.* at 176:5–10.)  After this meeting, Mozeleski told Papa "things had improved" with Macedon and that the harassment had subsided for a "couple weeks."  (*Id.* at 180:9–23.)  Then it "kind of picked up again."  (*Id.* at 181:2–5.)

Mozeleski said she was "so upset" about the harassment at this point that she spoke with "doctors."  (Pl.'s CSDMF ¶ 102.)  She said she considered leaving Lankenau but ultimately thought better of it.  (Mozeleski Dep. 201:3–9.)

B

1

Supervisors at Lankenau complete annual performance appraisals.  (Mozeleski Dep. 184:11–14.)  On September 20, 2019, Mozeleski was issued her first and only appraisal prepared by Macedon.  (Ex. C, ECF 15-3.)  Mozeleski received a three out of five, a grade given to a "Solid Performer," one who "[d]emonstrates all relevant performance standards and expectations," "[a]chieves desired results," "[f]ulfills all position requirements and may generate results above those expected of the position." (*Id.* at 1.)  The appraisal's "goals" section was incomplete, something Mozeleski raised with Papa, who, according to Mozeleski, said he would ask Macedon to complete it. (Papa Dep. 97:7–98:3; Mozeleski Dep. 246:21–247:7.)  Papa, though, could not remember how that issue was resolved.  (Papa Dep. 97:20–98:24.)

Mozeleski said she was "very upset" about the appraisal and claims she told Papa in a meeting that she thought it was retaliation for the formal discrimination complaint she filed six months earlier.  (Mozeleski Dep. 244:13–14; Pl.'s CSDMF ¶ 104.) Mozeleski felt she was "doing a very good job" and had never received an "average" rating, two levels lower than her score the previous year.  (Mozeleski Dep. 249:15–23, 250:11–251:2.)  As Mozeleski saw it, given the quality of her performance, retaliation was the only possible explanation for the downgrade.  (*Id.* at 251:9–15.)

Papa, however, thought Mozeleski received a "good evaluation," viewed it as a sign of improvement for her and didn't understand the appraisal "at all as retaliatory." (Papa Dep. 97:15–16, 99:7–11.)  In fact, the appraisal praised Mozeleski for having "made some strides with the transition of new leadership," being an "avid supporter of

9

her staff" and a regular patient safety advocate.  (Performance Appraisal 5.)  Mozeleski
herself acknowledged that "every manager has different expectations."  (Mozeleski Dep.
250:3–5.)  Indeed, she tried to be "honest" when completing her own performance
appraisals for subordinates.  (*Id.* at 184:15–22.)

2

In March of 2019, Mozeleski met with Macedon, Papa and possibly Price about
whether she would be placed on an "action plan," a list of tasks for an employee that is
tracked by supervisors.  (Mozeleski Dep. 140:3–141:6; Oral Arg. Tr. 8:14–16.)  That
July, with her communication issues persisting, Mozeleski was issued a job description
addendum.  (Mozeleski Dep. 181:13–17; Price Dep. 46:2–17.)  The intent was to
emphasize expectations for Mozeleski in her assistant nurse manager role and "give her
another chance."  (Macedon Dep. 60:20–61:8.)  It didn't work, "lapses" remained.  (Papa
Dep. 100:10–16.)  On October 22, 2019, after "so many" attempts to correct Mozeleski's
behavior, she was issued "performance coaching," which she described as a
"performance plan."  (Macedon Dep. 81:9–13; Mozeleski Dep. 255:24–256:5.)

The plan, a collaboration between Macedon and Price, stated Mozeleski's
communication style and her "response/communication to stakeholders in difficult
situations" was not meeting expectations.  (Performance Plan 110, Ex. D, ECF 15-3;
Macedon Dep. 81:8–82:14; Price Dep. 60:3–63:14.)  It listed examples of her
shortcomings as a communicator—for example, that she becomes "defensive" when
others speak up—and outlined performance expectations—such as Mozeleski needing
to stop "making excuses and placing blame when something doesn't go well."
(Performance Plan 110–11.)

10

The plan also included a statement from a doctor—who Mozeleski claimed knew of her hearing impairment—that the doctor's requests to Mozeleski "fall on deaf ears." (*Id.* at 111; Mozeleski Dep. 157:17–18.)  Mozeleski felt this comment was harassing, discriminatory and demeaning and noted Macedon and Price included it in the plan despite knowing about her hearing impairment.  *See* (Mozeleski Dep. 160:19–22, 161:18–162:1.)  Mozeleski considers this phrase "very offensive."  (*Id.* at 164:16–18.)

The day Mozeleski was placed on the plan, Price requested that she meet with her, Macedon and a human resources manager.  (*Id.* at 253:1–20.)  When she entered the meeting, Mozeleski saw Price holding the plan, and she "couldn't believe it" and "kind of mentally shut[]down."  (*Id.* at 254:19–23.)  Mozeleski remembers the plan being read, but the mental shutdown prevented her from hearing the details.  (*Id.* at 254:22–255:2.)

In Papa's view, however, the plan was "all" "positive" and a "gift" for Mozeleski, in that it could help her meet expectations.  (Papa Dep. 100:17–101:15.)  According to Price, she and Macedon saw Mozeleski's potential and thought the plan could help her realize it.  *See* (Price Dep. 44:4–45:15.)  Because their prior discussions with Mozeleski were unsuccessful, they used the plan to lay out "terms" and "goals" and "how we want [Mozeleski] to reach them."  (*Id.* at 44:15–45:10.)  Mozeleski has previously issued performance plans to her own staff but does not remember any employee reacting the way she did.  (Mozeleski Dep. 260:14–19.)

After the meeting, Mozeleski called her primary care doctor, Amy Smith, to schedule an appointment because she couldn't focus, was having palpitations and thought she was experiencing "some kind of mental breakdown."  (*Id.* at 256:11–20.)

11

Mozeleski saw Dr. Smith three days later.  (*Id.* at 257:11–13.)  According to Mozeleski, after she told Dr. Smith about her stress and perceived mental breakdown, Dr. Smith decided Mozeleski should take a ninety-day leave of absence, prescribed her anti-anxiety medication (Lexapro) and instructed her to see a therapist (which she did approximately five times).  *See* (*id.* at 261:1–19, 266:7–13, 267:1–3, 269:23–270:3).

Later that day, Mozeleski requested paid leave under the Family and Medical Leave Act.  (*Id.* at 257:14–16, 274:3–7.)  Mozeleski learned while on leave that Macedon resigned and Price left Lankenau.  (*Id.* at 290:3–14.)  Macedon, however, was still there when Mozeleski returned on January 24, 2020.  (*Id.* at 291:2–4.)  When she saw Mozeleski, Macedon approached her and said "oh, my God, you're back," "can I give you a hug?" and "I really missed you."  (*Id.* at 291:8–13.)  That was Mozeleski's last interaction with Macedon.  (*Id.* at 291:20–292:9.)

3

Soon after she returned from leave in January of 2020, Mozeleski learned her title would be changed from assistant nurse manager to coordinator because the former position was being eliminated.  *See* (Mozeleski Dep. 279:3–10, 283:5–6).  Mozeleski felt the new title was demeaning and understood it as a demotion, even though her pay and duties remained the same.  *See* (*id.* at 281:7–9, 283:7–9, 284:7–12; 300:4).  In fact, Mozeleski wound up keeping her position, "just with a different title"; practically, there was not "any difference" between the assistant nurse manager and coordinator roles, and she never even received a new job description.[4]  (Mozeleski Dep. 282:22–23, 283:7–

---

[4]      The coordinator role was designed to be "less managerial" than the assistant nurse manager position and more of a "coordinator charge nurse type role."  (Papa. Dep. 113:11–21.)  But in Mozeleski's case, her duties did not change notwithstanding the different title.  (Mozeleski Dep. 282:22–283:9.

12.)  Mozeleski nonetheless felt the title change was "direct retaliation" for her FMLA leave; she found it "highly suspicious" that the announcement came on her second day back.  (*Id.* at 283:23–284:3, 285:1–13.)  Even so, Mozeleski does not assert an FMLA retaliation claim.

Papa explained Mozeleski's assistant nurse manager role would have been eliminated whether she returned from FMLA leave or not.  (Papa Dep. 112:20–114:1.) The plan was to divide Macedon's nurse manager position into two roles and hire two employees to fill them.  (*Id.* at 112:20–113:9.)  Company "algorithms" and "parameters" dictated eliminating Mozeleski's assistant nurse manager position; Mozeleski would then take on the "specialty team coordinator" role.  (*Id.* at 112:23–113:10.)  The idea was to place Mozeleski in a "better role for this department and the workflow," while still taking advantage of her expertise.  (*Id.* at 114:11–21.)

On April 9, 2020, Mozeleski resigned, effective May 6.  (Mozeleski Dep. 295:12–14; Resignation Letter, Ex. F, ECF 15-3.)  Mozeleski said in her resignation letter that although she had "embraced my years here," the discrimination and retaliation she had been subjected to "over the past 18 months" made working at Lankenau "no longer an option."  (Ex. F.)

Mozeleski had not interacted with Price since the previous October, and Macedon had left two months earlier.  (Mozeleski Dep. 303:18–304:4.)  Mozeleski considered trying to "stick it out," but the Surgicenter had temporarily shut down because of the COVID-19 pandemic, and Mozeleski felt her position was "just not even a job anymore."  (*Id.* at 297:16–298:5.)  She was left doing "a lot of busy work," which she found unsatisfying.  (*Id.* at 299:11–18.)

13

II

A

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A fact is material if it may affect the case's outcome "under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A mere "scintilla" of evidence supporting the nonmoving party will not suffice. *Id.* at 252. Rather, to avoid summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial" and cannot "rest upon" pleadings. *Id.* at 256. These facts must enable it to "make a sufficient showing on essential elements" of its case that it bears the burden of proof on. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015).

On summary judgment, a court can consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999). It must "view the facts in the light most favorable to the nonmoving party and draw all inferences" in its favor. *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009) (internal quotation marks omitted). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010); *see also Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) (noting "speculation and conjecture" will not defeat a summary judgment motion). If a claim is supported by factual record evidence, the nonmovant must "direct the District Court's attention to those facts." *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d

14

571, 585 (E.D. Pa. 2017) (internal quotation marks omitted).  Additionally, the court may not make credibility determinations or weigh the evidence.  *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Armour v. City of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001)).

B

Mozelewski's discrimination and retaliation claims under the ADA and PHRA are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5]  For her discrimination claims, she first must establish a *prima facie* case of discrimination.  *Willis*, 808 F.3d at 644.  If she succeeds, it is the employer's burden to come forward with a "legitimate, [nondiscriminatory] reason" for its adverse employment action.  *Kengerski v. Harper*, 6 F.4th 531, 536 n.3 (3d Cir. 2021).  If the employer does so, the plaintiff must show the employer's proffered reason was a pretext for discrimination.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  Although the burden of production shifts back and forth, the "ultimate burden" of proving unlawful discrimination remains with the plaintiff "at all times."  *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

III

A

The ADA bars employers from discriminating against any "qualified individual on the basis of disability in regard to job application procedures, the hiring,

---

[5]     More generally, the Court can analyze Mozeleski's ADA and PHRA claims together because the statutes are interpreted the same way.  *See Capps v. Mondelez Global, LLC*, 847 F.3d 144, 150 n.1 (3d Cir. 2017).

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of disability discrimination under the ADA or PHRA, a plaintiff must demonstrate (1) she is disabled within the meaning of the ADA, (2) she is "otherwise qualified" for her position "with or without reasonable accommodations" and (3) she suffered an "adverse employment [action] as a result of discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

Mozeleski styles her disability discrimination claim as one of disparate treatment. (Oral Arg. Tr. 3:5–11.) Disparate treatment is cognizable under the ADA when an employer "single[s] out" and treats "some people less favorably than others because of" their disabled status. *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Liability is predicated on "whether the protected trait"—for an ADA claim, disability—"actually motivated" the employer's adverse action. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). But a disparate treatment claim will fail unless the employee's disability "actually played a role" in the action and "had a determinative influence on the outcome." *Id.*

An adverse employment action is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pennsylvania Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). Examples include termination and failure or refusal to hire. *See Komis v. Sec'y of United States Dep't of Labor*, 918 F.3d

16

289, 292 (3d Cir. 2019); *see also* 42 U.S.C. § 12112(b) (listing specific forms of ADA discrimination).  "[M]inor or trivial actions that merely make an employee 'unhappy,'" however, are not adverse employment actions.  *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 787 (3d Cir. 1998) (explaining that were it otherwise "every action that an 'irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit'" (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)));[6] *see also Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219–20 (3d Cir. 2014) (explaining "unpleasantness" or "frustrati[on]" in the workplace is insufficient).

ADA discrimination encompasses "adverse actions motivated by prejudice and fear of disabilities."  *Taylor*, 184 F.3d at 306.  One way a court can infer unlawful discrimination is from the identification of a similarly situated employee outside the plaintiff's protected class "who engaged in the same conduct but was treated more favorably."  *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013).  The plaintiff must show she and the comparator are similarly situated "in all relevant respects."  *Butler v. Arctic Glacier USA*, 213 F. Supp. 3d 711, 716 (E.D. Pa. 2016) (internal quotation marks omitted).  The identification of similarly situated comparators is not necessarily the only way she can satisfy this part of her *prima facie*

---

[6]     Mozeleski thinks *Mondzelewski* supports her but she misreads the opinion.  She seizes on a parenthetical for a Seventh Circuit case: "holding adverse action does not require loss of money or benefits but rather may consist of changes in location, duties, perks, or other basic aspects of the job."  *Id.* at 788 (referring to *Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)).  Mozeleski neglects the critical language from the Third Circuit quoted above.  *Mondzelewski* is factually inapt, too: Pathmark had plaintiff working Saturday-night "punishment shifts."  *See id.* at 787–88.  Mozeleski experienced nothing like that.

case.  *See, e.g.*, *Collins v. Kimberly-Clark Pennsylvania, LLC*, 708 F. App'x 48, 52 (3d

Cir. 2017); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37–38 (2d Cir. 1994).

B

Defendants do not argue that Mozeleski is not disabled or was not otherwise

qualified for her position at Lankenau.  (Defs.' Brief in Supp. of Summ J. Mot. 8–9, ECF

15-1.)  The only issue is whether she suffered any adverse employment actions as a

result of discrimination based on her hearing impairment.  Mozeleski cites to four

specific, and one general, alleged discriminatory adverse employment actions: Macedon

and Price accusing her of recording a conversation between the three of them in March

of 2019, her September 2019 negative performance appraisal, placement on the

performance improvement plan in October of 2019, the changing of her job title from

assistant nurse manager to coordinator in January of 2020 and that she was subjected

to a hostile work environment.  (Oral Arg. Tr. 55:24–56:6, 58:1–4.)

1

Mozeleski relies exclusively on a disparate treatment theory but points to no

non-hearing impaired employees in like circumstances who were treated more

favorably than her.  *See* (Oral Arg Tr. 43:6–45:9).  In fact, she expressly conceded at

oral argument that there is no record evidence of disparate treatment discrimination.[7]

(*Id.* at 45:12–20.)

---

[7]    This concession applies not only to all her alleged adverse employment actions but also
allegations about what Mozeleski perceived as Price asking her to "falsify" temperature and
humidity logs, and Macedon raising issues in front of staff without first telling Mozeleski.  (Pl.'s
Memo in Opp. to Defs.' Summ. J. Mot. 8; Pl.'s Counter Statement of Disputed Material Facts
(CSDMF) ¶ 95, ECF 16-3.)

i

With respect to the accusation that Mozeleski secretly recorded a conversation with Macedon and Price in March of 2019, Mozeleski does not contend the accusation itself or the 2:30 p.m. meeting it was made in is the adverse action.  She claims instead the adverse action was her being asked to leave the building that afternoon pending an investigation into the incident, without being paid for the rest of the day.  (Oral Arg. Tr.46:11–47:1.)  Mozeleski interpreted this as an unpaid suspension.  (Mozeleski Dep. 143:24–145:4.)

The allegation that she recorded the conversation isn't an adverse employment action.  Mozeleski argues her compensation was "altered" when she was instructed to go home early that afternoon without a full day's paycheck.  *See Jones*, 796 F.3d at 326.  But even if true, the ADA was not designed to remediate an employee losing pay for an hour or two while her employer looks into whether she violated company policy and broke the law.  *See* (Oral Arg. Tr. 79:23–80:4.)  Mozeleski herself described her wage loss that day as an "insignificant amount of pay."  (Mozeleski Dep. 144:14–20); *cf. Waring v. Aramark Mgmt., LLC*, No. 19-5472, 2020 WL 1435183, at *1–3 (E.D. Pa. Mar. 24, 2020) (noting that "paying an individual a lower salary for discriminatory reasons"—in this case, an annual base salary $25,000 to 35,000 less than a similarly situated employee of a different gender—"can be an adverse employment action" (internal quotation marks omitted)).

Moreover, the record is unclear as to whether Mozeleski was, as she claims, suspended without pay, when told to leave work early that day.  Again, no one told her she was being suspended.  (Mozeleski Dep. 144:21–145:4.)  Even if she was, this was a

minor action—not a materially adverse one. *See Mondzelewski*, 162 F.3d at 787; *cf. Friel v. Mnuchin*, 474 F. Supp. 3d 673, 686–87 (E.D. Pa. 2020) (concluding an employee suffered an adverse employment action when he was suspended five days without pay, which rendered him ineligible for a time-off award the next year equal to about a week's pay).

Finally, Mozeleski being told to go home while the matter was looked into had nothing to do with her hearing impairment. Even assuming Price or Macedon knew at the time that Mozeleski was hearing-impaired,[8] the Court cannot infer that either of them treated her differently because of the impairment. The best Mozeleski can do to connect the recording-accusation incident to her hearing impairment is to attempt to change her deposition testimony by now claiming that she wanted to record her conversations with Macedon and Price because she couldn't hear them. *See* (Oral Arg. Tr. 41:16–25). That directly contradicts her testimony that the reason she sought to record these discussions was that she was "very concerned" about them. (Mozeleski Dep. 145:9–19, 146:7–12.)

ii

Mozeleski believed she was doing great work in 2019 and could think of no reason, other than disability-based discrimination, that she was given an "average"

---

[8]     There is an immaterial factual dispute about whether Macedon or Price knew of Mozeleski's hearing impairment on the day of the recording-accusation incident. Price said she did not become aware of the impairment until after she left Lankenau, while Macedon stated she first learned of it when Mozeleski formally complained in a March 18, 2019 email that Macedon harassed her. (Price Dep. 21:4–19; Macedon Dep. 63:18–24.) (Unlike Macedon, Price was not named in the email. (Discrim. Compl.)) Mozeleski testified this recording incident took place roughly a week before she sent that email. *See* (Mozeleski Dep. 148:7–149:5). If neither Macedon nor Price knew Mozeleski had a hearing impairment, they could not have acted on the basis of it. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003). The only support for the claim that they did know is Mozeleski's testimony, which the Court credits for purposes of this Motion. (Oral Arg. Tr. 42:1–5.)

performance appraisal in September of that year.  *See* (Mozeleski Dep. 249:15–23, 250:11–251:2, 251:9–15).

The performance appraisal did not change the terms or conditions of Mozeleski's employment.  In any event, a negative performance assessment in itself is not an adverse employment action.  *See Walker*, 558 F. App'x at 220 (citing *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)).  While Mozeleski's rating upset her, especially given her scores on prior appraisals, unhappiness is not enough to get past summary judgment.  *See Mondzelewski*, 162 F.3d at 787; (Mozeleski Dep. 244:13–14, 249:21–23).

Even if the 2019 appraisal was a downgrade from the year before, it was an objectively positive evaluation of her work.  It indicated Mozeleski met performance standards, produced desired results and may have exceeded expectations.  *See* (Performance Appraisal 1).  The appraisal further praised her for showing signs of improvement in working with new management, among other things.  (*Id.* at 5.)  Papa was also complimentary, describing the appraisal as a "good" one.  (Papa Dep. 97:15–16, 99:7–11.)

Even if an annual review an employee doesn't like could constitute an adverse employment action, the Court cannot infer Mozeleski's was motivated by unlawful discrimination.  Mozeleski felt this was the only possibility because she thought she was "doing a very good job."  (Mozeleski Dep. 249:15–23.)  Like many of Mozeleski's allegations, this is nothing more than guesswork based only on her perceptions and suppositions.  *See Acumed*, 561 F.3d at 228; *e.g.*, (Discrim. Compl. (Mozeleski asserting that "[i]n light of the fact that I previously have had great working relationships with

my managers & excellent evaluations, I can only perceive that [Macedon's] harassment is related to" her disability and age)).

iii

Placing Mozeleski on the performance improvement plan in October of 2019 was not an adverse employment action either.  The plan contained feedback on Mozeleski's work style and commented on aspects of her communication skills that could be improved, along with expectations for her performance.  (Performance Plan 110–11.)

None of this altered the terms or conditions of Mozeleski's employment, something her lawyer acknowledged at oral argument.  *See Komis*, 918 F.3d at 292; (Oral Arg. Tr. 47:13–23).  Mozeleski seems to take the position that an employee suffers an adverse employment action any time she is placed on a performance improvement plan.  Mozeleski claimed, without legal support, that the plan in this case "changed the course of how she was expected to do her job on a daily basis." (*Id.* at 56:8–57:21.)  In fact, one court of appeals has specifically held that placement on an employee improvement plan that includes communication skills is not an adverse employment action.  *Payan v. UPS*, 905 F.3d 1162, 1173–74 (10th Cir. 2018) (applying the broader retaliation standard and citing cases from multiple other circuits).

And again, even if putting Mozeleski on a performance improvement plan could somehow be deemed an adverse employment action, there is no evidence it was motivated by any prejudice against her due to a hearing impairment.  *See Taylor*, 184 F.3d at 306.  The document Price and Macedon collaborated on amounts to a standard assessment of where an employee was falling short and how she could fix it.  To that end, they compiled complaints from others to help Mozeleski improve her performance.

22

*See* (Performance Plan).  Of course, the plan deals with Mozeleski's communication issues, and she suggests the possibility that some of these may be at least partially tied to her hearing problems.  *See* (Mozeleski Dep. 154:2–8).  But that tenuous link falls well short of establishing that Mozeleski was placed on the plan for discriminatory reasons. Most of the plan's comments have nothing to do with the ways Mozeleski says her impairment affects her communication skills.  There is no mention, for example, about the volume of Mozeleski's voice, and there are only ambiguous, oblique references to her difficulty recognizing when others are done talking.  *See* (Performance Plan).

The plan is filled with critiques like this one: Mozeleski "makes statements about staffing when we have extra staff coming in."  (*Id.* at 111.)  That obviously has nothing to do with her hearing.

iv

Mozeleski's title may have changed from assistant nurse manager to coordinator in January of 2020, but the terms and conditions of her employment did not.  *See Storey*, 390 F.3d at 764.

There is no dispute that the change did not affect her salary.  (Oral Arg. Tr. 48:16–19.)  Nor did it alter her duties.  The coordinator role was expected to be "less managerial" than Mozeleski's assistant nurse manager position.  (Papa. Dep. 113:11–21.)  But her duties did not change when she took on the new title.  (Mozeleski Dep. 282:22–283:9.)  Mozeleski kept her position, "just with a different title," and there was no practical difference between her assistant nurse manager and coordinator roles.  (*Id.* at 282:22–23, 283:7–12.)  The only change in her job duties was caused by the pandemic.  (*Id.* at 297:16–298:5, 299:11–18.)

With nothing tangible to latch onto, Mozeleski says she thought the title change was demeaning.  (*Id.* at 284:7–12.)  "Feeling demeaned," obviously, is not enough.

v

Mozeleski cannot establish a *prima facie* case of disparate treatment discrimination under the ADA because she suffered no adverse employment actions as a result of discrimination.  Even if she had, the Defendants have pointed to legitimate, nondiscriminatory reasons for their actions.  *See Burton*, 707 F.3d at 426.

At this stage, the employer has a "minimal" burden it can satisfy by introducing evidence that, if taken as true, "would permit the conclusion that there was a nondiscriminatory reason" for what it did.  *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012); *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).  It need only articulate "any legitimate reason" for its actions, even if that reason did not "actually motivate[]" them.  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)).  If the employer succeeds, the burden shifts back to the plaintiff to prove pretext.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.3 (2003).

The Defendants have legitimate, nondiscriminatory reasons for those actions Mozeleski perceives as adverse and discriminatory.  The recording-accusation incident was raised with Mozeleski and investigated because, if true, the recording would have been illegal and against company policy.  (Oral Arg. Tr. 79:23–80:4.)  And Mozeleski's disappointment with her 2019 performance appraisal resulted from a mismatch between her own evaluation of her performance and Macedon's.  A new manager with

24

different expectations took a fresh look at Mozeleski's performance and assessed it as she saw fit. *See also* (Mozeleski Dep. 250:3–5 (Mozeleski acknowledging "every manager has different expectations")).

Placing Mozeleski on the performance plan in October of 2019 was the culmination of repeatedly unsuccessful efforts over the course of several months to improve her performance through other means. There were discussions about placing Mozeleski on a different, task-based work plan as early as the previous March. (Mozeleski Dep. 140:3–6, 140:21–141:6; Oral Arg. Tr. 8:14–16.) Mozeleski's superiors held off at that time on the performance plan in favor of an intermediate measure that July, namely issuing her a job description addendum. (Mozeleski Dep. 181:13–17; Price Dep. 46:2–17.) Only when that didn't work did they place her on the performance plan three months later. (Macedon Dep. 81:9–13; Mozeleski Dep. 255:24–256:5.)

The January 2020 job title change was precipitated by the division of Macedon's nurse manager position into two roles. (Papa Dep. 112:20–113:9.) Company logistics necessitated that Mozeleski's assistant nurse manager position be eliminated. *See* (*id.* at 112:23–113:10). The idea was for Lankenau to continue to use Mozeleski's expertise—only in a role that made more sense for the company's workflow. (*Id.* at 114:11–21.)

The evidence shows there were legitimate, non-discriminatory reasons supporting the Defendants' actions, and Mozeleski points to nothing in the record that could establish these reasons were pretexts for discrimination. *See Lichtenstein*, 691 F.3d at 302; *Raytheon*, 540 U.S. at 54 n.3.

2

Mozeleski contends she was subjected to a hostile work environment, though not as an independent claim. *See* (Compl. ¶¶ 63–86; Oral Arg. Tr. 39:6–15). Rather, she contends the hostile work environment was an adverse employment action for purposes of her disparate treatment discrimination claim. (Pl.'s Memo in Opp. to Defs.' Summ. J. Mot. 6–7, 10, ECF 16-1.) In doing so, she relies exclusively on *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 172–74 (3d Cir. 2014). Mozeleski says the hostile work environment consisted of ongoing discussions and meetings about her verbal communication style, criticisms of her emails related to her written communication style, Macedon and Price's inclusion of a doctor's discriminatory comment in the October 2019 performance plan and a meeting about an allegedly unprofessional email. (Oral Arg. Tr. 64:10–16, 65:3–66:7, 67:8–22.)

i

The *McDonnell Douglas* framework does not govern hostile work environment claims. *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017). To prevail on such a claim under the ADA or PHRA, a plaintiff must demonstrate (1) the "employee suffered intentional discrimination" because of her disability, (2) the "discrimination was severe or pervasive," (3) the "discrimination detrimentally affected" her, (4) the "discrimination would detrimentally affect a reasonable person in like circumstances" and (5) the "existence of *respondeat superior* liability." *Mandel*, 706 F.3d at 167.

The Court considers whether the harassment was severe or pervasive only if it was on account of the employee's disability. *See Walton v. Mental Health Ass'n of Se.*

26

*Pennsylvania*, 168 F.3d 661, 667 (3d Cir. 1999); *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007); *see also Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (explaining that although many employees are harassed, one cannot obtain relief if the reason for the harassment is "one that is not proscribed" by federal employment discrimination laws). To prove the harassment was severe or pervasive, the employee must show her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

While the harassment can be "severe *or* pervasive," claims targeting the "ordinary tribulations of the workplace" are not actionable. *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (emphasis added); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Nor are allegations about "[o]ccasional insults, teasing, or episodic instances of ridicule." *Jensen*, 435 F.3d at 451. Courts must look at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

ii

Mozeleski concedes the harassment to which she was allegedly subjected was not severe enough to create a hostile work environment, s*ee* (Pl.'s Memo in Opp. to Defs.' Summ. J. Mot. 19), so she claims it was pervasive. But it must be sufficiently pervasive to alter the conditions of her employment, and it was not. *See Harris*, 510 U.S. at 21.

Moreover, most of the conduct of which she complains had nothing to do with her hearing impairment. *See Walton*, 168 F.3d at 667.

Mozeleski contends the hostile work environment consisted in part of "ongoing meeting and discussions" with Macedon and Price about her verbal communication style. (Oral Arg. Tr. 64:12–16.) According to Mozeleski, these took place on a "regular basis." (*Id.* at 64:16.) She provided no further specification, pointing only to her testimony that they happened "fairly frequently." (*Id.* at 64:18–25.)

Mozeleski uses fuzzy adjectives suggesting temporal frequency to paper over an absence of evidence supporting her allegations. But the record points to discrete instances when Macedon and Price discussed her verbal communication issues with her. Specifically, Mozeleski detailed meetings with Macedon and Price in January, February and March of 2019. *Accord* (Macedon Dep. 42:10–12 (describing discussions with Mozeleski and Price about Mozeleski's communication taking place "almost every other month")). Although Mozeleski's verbal communication shortcomings were broached at these meetings, most of the topics discussed were far removed from her hearing impairment: the need for Mozeleski to heed the chain of command with respect to her comments at OR steering committee meetings, her inappropriate remark about her workload at a coordinator meeting, her responsibility for certain "deficiencies" that could affect an upcoming event, among others. *See supra* subsection I.A.2. Not even Macedon's and Price's alleged micromanagement of Mozeleski, a talking point at the March 2019 meeting, is evidence of a hostile work environment. *Warfield v. SEPTA*, No. 10-3023, 2011 WL 1899343, at *6 n.7 (E.D. Pa. May 19, 2011). These discussions do not reflect disability-based bias. *See Andreoli*, 482 F.3d at 643.

True, Mozeleski spoke more generally about being "continually berated for my verbal communication and for speaking up."  (Mozeleski Dep. 116:23–24); *see also, e.g.*, (Pl.'s Memo in Opp. to Defs.' Summ. J. Mot. 19 (stating Macedon and Price "constantly berated and badgered" her about communication problems related to her hearing impairment) (underline in original)).  And Price did describe conversations with Mozeleski about problems concerning the manner and contents of her communication with colleagues, among other topics.  *See* (Price Dep. 44:16–45:2, 60:8–61:7, 61:22–62:17).  But most of the issues discussed are not tied to her hearing impairment.  *See, e.g.*, (Price Dep. 61:1–4 (describing discussions with Mozeleski about her needing to maintain a positive attitude)).

iii

Mozeleski also points to criticisms of her emails related to her written communication style and a meeting about one particular unprofessional email.  (Oral Arg. Tr. 65:3–7, 67:8–22.)

In particular, Mozeleski contends Price took issue with her using the word "interesting" in an email and that Macedon told her, "you write how you talk." (Mozeleski Dep. 114:4–17, 115:4–7; Pl.'s CSDMF ¶ 92.)  She also claims Price thought it was unprofessional for her to use the phrase "once again" in an email, and that Price asked Mozeleski to meet with her and Papa about it.  (Mozeleski Dep. 222:17–223:18; Defs.' SOMF ¶ 40.)  Again, this alleged conduct does not pertain to Mozeleski's hearing disability.

An employee who meets her boss's expectations "must understand a new boss," like Macedon and Price, "may not be satisfied with the same old performance."

*Cameron-Satchell v. CDHA Mgmt. LLC*, No. 21-576, 2021 WL 4902342, at *1 (E.D. Pa. Oct. 21, 2021) (explaining new bosses can "independently evaluate performance"). That principle applies to relatively minor matters like email word choice. The criticism of Mozeleski's emails may have seemed to her picayune, but there is no evidence it was tied to her hearing impairment. *See Andreoli*, 482 F.3d at 643.

iv

Lastly, Mozeleski focuses on the inclusion in the performance plan of a doctor's comment that she found discriminatory and harassing. The doctor said her requests to Mozeleski "fall on deaf ears." (Performance Plan 111.) She considers this idiom "very offensive." (Mozeleski Dep. 164:16–18.)

To be sure, the comment was a poor choice of words, especially if, as Mozeleski contends, the doctor knew of Mozeleski's hearing impairment. (Mozeleski Dep. 157:17–18.) But this isolated remark from someone outside the chain of command does not constitute disability-based harassment from Macedon or Price, the only two people Mozeleski alleges harassed her. *See Jensen*, 435 F.3d at 449.

Mozeleski does not claim Macedon or Price ever said such a thing. She merely faults them for including the comment as part of a compilation of feedback from her coworkers. *See* (Performance Plan). Mozeleski may have every right to be put off by the remark, but it did not create or contribute to any alleged hostile work environment. Federal employment discrimination statutes are not meant to create a "general civility code" for the office or "mandate a happy workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *Jensen*, 435 F.3d at 451. Macedon and Price had no obligation to sanitize the report.

The harassment Mozeleski claims she suffered was not pervasive enough to alter the conditions of her employment.[9]  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

## IV

### A

The analogous anti-retaliation provisions in the ADA and PHRA prohibit employers from discriminating against employees because they opposed unlawful discriminatory acts or practices.  42 U.S.C. § 12203(a); Pa. Stat. and Cons. Stat. § 955(d).  To establish a *prima facie* retaliation case under the ADA or PHRA, the plaintiff must show (1) she engaged in protected activity, (2) the employer took an adverse employment action against her and (3) a causal connection between the two. *Kengerski*, 6 F.4th at 536 (quoting *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d. Cir. 2006)).

---

[9]      Nor has Mozeleski established the alleged harassment detrimentally affected her or that it would have detrimentally affected a reasonable person in like circumstances.  *See Mandel*, 706 F.3d at 167.  She claims without support that she talked to "doctors" about the alleged harassment in the spring of 2019.  (Pl.'s CSDMF ¶ 102.)  While this may show it negatively impacted Mozeleski at one point, her hostile work environment claim extends far beyond that period.  *See, e.g.*, (Pl.'s Memo in Opp. to Defs.' Summ. J. Mot. 18 (asserting that "[t]hroughout Price and Macedon's supervision" of Mozeleski, they had constant meetings to discuss and criticize her communication style), 20 (stating Macedon's and Price's conduct "continued unabated until they drove [Mozeleski] from the workplace" when she took FMLA leave in October of 2019, "clearly demonstrating its pervasiveness")).  Mozeleski failed to show how the harassment impacted her for most of this broad timeframe.  *See Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 132 (E.D. Pa. 2020) (citing *Walton*, 168 F.3d at 667).

        Mozeleski also fails to show the alleged harassment would have detrimentally affected a reasonable person in similar circumstances.  *See Mercer v. Se. Pennsylvania Transit Auth.*, 26 F. Supp. 3d 432, 443 (E.D. Pa. 2014) (citing *Mandel*, 706 F.3d at 167).  She allegedly suffered what she thought was a mental breakdown upon learning she was being placed on the performance plan.  (Mozeleski Dep. 256:14–16.)  But she alleges her placement on the plan—to be distinguished from the inclusion of one comment therein—as an adverse employment action separate from the hostile work environment.  *See supra* subsection III.B.1.iii; (Oral Arg. Tr. 64:10–70:8).  Even if the Court were to consider the entire plan as part of her fallback, catch-all hostile work environment claim, Mozeleski admitted her reaction to the plan was extraordinary—and thus unreasonable—based on her experience.  (Mozeleski Dep. 260:14–19.)

The Court considers a "broad array of evidence" to determine whether there is a causal connection between the protected activity and adverse employment action. *Moody*, 870 F.3d at 221 (internal quotation marks omitted).  The plaintiff cannot show causation unless those behind the adverse employment action "knew of the plaintiff's protected conduct" when they took it.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

She must also produce evidence about the "scope and nature of conduct and circumstances that could support" a causal link from her protected activity to the adverse employment action.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).  The plaintiff needs to show an "unusually suggestive temporal proximity" between the two, a "pattern of antagonism coupled with timing" or "evidence gleaned from the record as a whole."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (internal quotation marks omitted).  A plaintiff can proffer evidence of "intervening antagonism or retaliatory animus" and "inconsistencies in the employer's articulated reasons for terminating the employee," among other record evidence.  *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232–33 (3d Cir. 2007).

No "bright-line rule" exists for when the timing of an adverse employment action is "unusually suggestive."  *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361 (3d Cir. 2021).  But any gap three months or longer is not unusually suggestive.  *LeBoon*, 503 F.3d at 233 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *see also Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (holding an approximately three-week lag was insufficient).  Additionally, a "constant barrage" of

employer actions in the intervening period can constitute a pattern of antagonism.  *See Robinson v. Se. Pennsylvania Transp. Auth.*, 982 F.2d 892, 895–96 (3d Cir. 1993).  That is not true, however, for several actions if they are neither consistent nor continuous, and there is no basis for connecting them to the protected activity.  *See Bartos v. MHM Corr. Servs., Inc.*, 454 F. App'x 74, 78–79 (3d Cir. 2011).

Courts "must be diligent" when applying these causation principles.  *Lauren W*, 480 F.3d at 267.  The "ultimate question" in a retaliation case is whether there is an "intent to retaliate."  *Moore*, 461 F.3d at 342 (internal quotation marks omitted).

The parties agree Mozeleski engaged in protected activity (1) on March 18, 2019, when she sent an email to Carrick, with Papa copied, formally complaining of disability discrimination; and (2) in September of 2019, when she alleged retaliation regarding her performance appraisal in a meeting with Papa.  (Defs.' Brief in Supp. of Summ J. Mot. 9; Pl.'s Memo in Opp. to Defs.' Summ. J. Mot. 12; Defs.' Reply Brief in Supp. of Summ. J. Mot. 7, ECF 18.)  The only questions are whether Mozeleski suffered any adverse employment actions and, if so, whether they were causally connected to her protected activity.  Mozeleski alleges the same adverse employment actions as she does for her disparate treatment discrimination claim, besides the hostile work environment. (Oral Arg. Tr. 58:10–16, 82:17–83:5.)

B

None of the conduct Mozeleski points to for her retaliation claim is an adverse employment action for reasons the Court explained in subsection III.B.1.  This is true even though retaliation claims include a more generous standard for adverse employment actions than disparate treatment discrimination claims.  *See Burlington N.*

& *Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted) (explaining the plaintiff must demonstrate a "reasonable employee would have found the challenged action materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"). Even if the conduct Mozeleski alleges were adverse employment actions, she could not show a causal connection between them and her two instances of protected activity.

The first alleged adverse employment action is the incident involving Macedon and Price's accusation that Mozeleski surreptitiously recorded a conversation with them. This can't constitute retaliation because it predated her first instance of protected activity. *See Daniels*, 776 F.3d at 196. Specifically, Mozeleski testified the incident took place about a week before she sent her March 18, 2019 email. (Mozeleski Dep. 148:7–149:5.)

The disappointing September 20, 2019 performance appraisal came six months after she sent the March 18 email. The temporal proximity between the protected activity and alleged adverse action is not unusually suggestive. *See LeBoon*, 503 F.3d at 233. Nor is there a pattern of antagonism or any other evidence that would allow the Court to infer a causal link. Again, Mozeleski cannot rely on murky claims about frequent "meetings" and "discussions" with Macedon and Price concerning her communication issues. *See supra* subsection III.B.2.ii. Set those aside, and Mozeleski is mostly left with similarly imprecise allegations.

She said the alleged harassment subsided "for a couple weeks" at some point in the spring of 2019 after she sent the email on March 18, but then it "kind of picked up again." (Mozeleski Dep. 180:9–181:5.) There was also an HR meeting in August about

34

Mozeleski's email word choice.  (*Id.* at 222:17–223:18.)  This doesn't come close to a constant barrage of employer actions.  *See Robinson*, 982 F.2d at 895–96.  The connection between Mozeleski's protected activity and the alleged adverse employment action is too "attenuated and remote in time."  *Bartos*, 454 F. App'x at 79.

The next alleged adverse employment action is Mozeleski's placement on the performance improvement plan on October 22, 2019.  This took place after Mozeleski's second act of protected activity, her September 2019 meeting with Papa.  At the outset, there is no evidence Price or Macedon knew about this meeting.[10]  (Oral Arg. Tr. 70:16–71:6.)

While a one-month gap may constitute unusually suggestive timing, *see LeBoon*, 503 F.3d at 233, here it is not, *see also Dudhi v. Temple Health Oaks Lung Ctr.*, No. 18-3514, 2019 WL 426145, at *8 (E.D. Pa. Feb. 4, 2019) (explaining courts usually "consider periods of days or weeks, not months" to be unusually suggestive and collecting cases).  Nor is there any other evidence, including of an antagonistic pattern, in the intervening month between the meeting and Mozeleski's placement on the plan suggesting a causal connection.  *See Lauren W.*, 480 F.3d at 267.

Finally, Mozeleski alleges the January 2020 change in job title was an adverse employment action.  Mozeleski's story about this allegation shifted between her deposition testimony in September of 2021 and her declaration filed in response to Defendants' Summary Judgment Motion two months later.  (Exs. A, J, I.)  At her deposition, she testified that she believed the title change was retaliation for taking a

---

[10]     Mozeleski testified Papa told her he would ask Macedon to complete the "goals" section of her appraisal.  (Papa Dep. 97:20–98:3; Mozeleski Dep. 246:21–247:7.)  But Papa could not remember if he spoke with her, and there is no evidence in the record he did so.  (Papa Dep. 97:20–98:24.)

90-day FMLA leave, nothing else.  (Ex. J 283:23–284:3, 285:1–13, 287:5–10.)  In her

declaration, however, Mozeleski swore the title change was attributable to her opposing

and reporting Macedon's and Price's alleged harassment and discrimination.  (Ex. I ¶

21, ECF 16-2.)

         The declaration is, in relevant part, a sham affidavit.  *See SodexoMAGIC,*

*LLC v. Drexel Univ.*, 24 F.4th 183, 208–09 (3d Cir. 2022).  A sham affidavit contradicts

earlier deposition testimony.  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d

Cir. 2007).  Absent a "plausible explanation" for the contradiction or "independent

evidence in the record," the affidavit cannot establish a genuine factual issue for trial.

*Baer v. Chase*, 392 F.3d 609, 623–24 (3d Cir. 2004); *Daubert v. NRA Group, LLC*, 861

F.3d 382, 392 (3d Cir. 2017) (internal quotation marks omitted).

         While the Third Circuit has adopted a "flexible" approach to the sham affidavit

doctrine, so that "not all contradictory affidavits are necessarily shams," courts should

conclude a reasonable jury could not give an affidavit evidentiary weight if it was

offered for the sole purpose of defeating summary judgment.  *EBC, Inc. v. Clark Bldg.*

*Sys., Inc.*, 618 F.3d 253, 269 (3d Cir. 2010) (internal quotation marks omitted); *Jiminez*,

503 F.3d at 253.  And practically speaking, "prior depositions are more reliable than

affidavits."  *Jiminez*, 503 F.3d at 253.

         Here, there is a clear conflict between Mozeleski's prior deposition testimony

that she believed the job title change was retaliation for her FMLA leave (making the

absence of an FMLA claim somewhat curious) and her more recent assertion in the

declaration that it was retaliation for opposing discrimination and harassment.

*Compare* (Mozeleski Dep. 287:5–10), *with* (Mozeleski Decl. ¶ 21).  But there is no

36

independent record evidence showing the title change was retaliation for anything else (or for Mozeleski's FMLA leave), and Mozeleski had no explanation for the disconnect. *See* (Oral Arg. Tr. 54:20–55:23). Her declaration is a sham that cannot create a genuine issue for trial. *See Baer*, 392 F.3d at 624.

Even if Mozeleski had properly alleged retaliation regarding her job title change, she would be unable to show a causal link to her protected activity. The four-month span between her meeting with Papa in September of 2019—sometime after she was issued her performance appraisal on the 20th—and her January 2020 change in title from assistant nurse manager to coordinator is not unusually suggestive timing. *See LeBoon*, 503 F.3d at 233.

There is also no other evidence, including of a pattern of antagonism, sufficient to establish causation. Mozeleski was on FMLA leave for three of the four intervening months. (Defs.' SOMF ¶ 53, 56.) One of her alleged harassers, Price, left in the interim and had no interactions with Mozeleski after her leave began in October of 2019. (Mozeleski Dep. 290:12–14, 292:13–15.) The other, Macedon, tendered her resignation while Mozeleski was on leave but was still working when Mozeleski returned. (*Id.* at 290:4–7, 291:2–4.) In their only interaction before Macedon also left Lankenau, Macedon said she really missed Mozeleski, and they hugged. (*Id.* at 291:8–19.)

Mozeleski has failed to establish a *prima facie case* of retaliation. Even if she had, Defendants have demonstrated legitimate nonretaliatory reasons for their actions,

and there is nothing in the record to show these reasons were pretexts for discrimination.[11]  *See supra* subsection III.B.1.v.


       An appropriate Order follows.


                    BY THE COURT:


                    ***/s/ Gerald J. Pappert***
                    GERALD J. PAPPERT, J.

---

[11]    Mozeleski's final claim is for aiding and abetting under the PHRA, against only Macedon and Price.  (Compl. ¶¶ 84–86.)  It fails because there is no underlying discrimination or retaliation for them to aid or abet.  *See Ramirez v. Palmer Twp.*, 292 F. Supp. 3d 609, 629 (E.D. Pa. 2018).